1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                               DISTRICT OF NEVADA

8                                      * * *

9    UNITED STATES OF AMERICA,          )
                                        )
10          Plaintiff,                  )          2:09-cr-00248-RCJ-RJJ
                                        )
11                                      )          REPORT &   RECOMMENDATION
     vs.                                )             OF UNITED STATES
12                                      )            MAGISTRATE JUDGE
                                        )          (Defendant's Motion to Suppress #18)
13   KEVIN RAY SCHULTZ,                 )
                                        )
14          Defendant.                  )

15          This matter came before the court for an evidentiary hearing on Defendant's Motion to

16   Suppress (#18).  The court has considered the Defendant's Motion (#18); the Government's

17   Response (#20); the Defendant's Reply (#23); and the testimony and evidence presented during the

18   hearing.

19                                   **BACKGROUND**

20          On June 10, 2009, Defendant Kevin Ray Schultz was indicted and charged with being a felon

21   unlawfully in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  The

22   Government also seeks the forfeiture of certain property from Schultz pursuant to 18 U.S.C. §

23   922(d)(1) and 28 U.S.C. § 2461(c).

24          A few days prior to February 17, 2009, Las Vegas Metropolitan Police Department (LVMPD)

25   Detective Joe Giannone received a tip from an unidentified source claiming that Schultz possessed

26   a gun.  At the time, Giannone was a detective in LVMPD's repeat offender unit which conducts

27   surveillance on individuals with multiple felony convictions.  The surveillance is primarily

28   performed undercover. On February 17, 2009, Giannone and approximately seven other members

1    of the repeat offender unit began conducting surveillance on Schultz.  Ultimately, Schultz was

2    stopped for a traffic infraction and his vehicle searched pursuant to LVMPD's impound and

3    inventory policy.  As a result of the search, officers recovered a stolen credit card and a fake

4    identification card.  The officers did not find a gun.  Consequently, Schultz was arrested for

5    possession of a credit card without the owner's consent and possession of false document to obtain

6    false status and booked into the Clark County Detention Center (CCDC). .

7           On February 18, 2009, Giannone received a second tip from the same unidentified source

8    indicating that the officers missed the gun during the inventory search of Schultz' vehicle.

9    Accordingly, Giannone and his partner, Detective David Denton, went to CCDC to interview

10   Schultz.  Both testified  that Schultz was given the *Miranda* warnings and waived them.  Both

11   detectives testified that Schultz made several incriminating statements, including giving a detailed

12   description of the location of the gun in his car.  The interview was not recorded and Schultz was

13   not presented with a written waiver.  Schultz denies he made any statements.  However, based on

14   Schultz' alleged statements, Detective Denton applied for and obtained a search warrant.  During

15   a second search of the car, officers recovered a gun.

16   **A.  February 17, 2009, Surveillance And Traffic Stop**

17          There are disparities between the details of the original arrest report and the supplemental

18   arrest report produced just prior to the suppression hearing.  The original arrest report provides that

19   detectives from the repeat offender unit were "conducting surveillance" on Schultz "at approximately

20   [10:00 p.m.]".  *See* Exhibit A attached to Schultz' Motion (#18).  The original report provides that,

21   after seeing Schultz run a stop sign while turning north onto Las Vegas Boulevard at the intersection

22   of Ford Avenue, Giannone contacted a marked patrol unit to initiate a traffic stop.  During the stop,

23   Officers John Quintana and Robert Grantham determined that neither the driver, nor the passenger

24   had a valid driver's license and, therefore, the vehicle would be impounded. During the inventory

25   search, items were found which led to Schultz' arrest.

26          The supplemental report, as well as the hearing testimony, paints a more detailed picture of

27   the events.  A few days prior to Schultz' arrest, Giannone received a tip from an unidentified source

28   claiming that Schultz was in possession of a gun.  On February 17, 2009, at around 9:00 p.m.,

1   Giannone and approximately seven other members of the repeat offenders unit began surveillance

2   of Schultz' car as it left a hotel located on Harmon Boulevard.  The car was registered to Schultz and

3   his girlfriend, who was a passenger in the car.  At approximately 9:15 p.m., Giannone saw Schultz

4   run a stop light at the intersection of Tropicana and Audrey.  Despite having the authority and ability

5   to do so, Giannone did not initiate a traffic stop.  Instead, Giannone requested that dispatch send

6   additional officers to conduct the traffic stop.  Giannone testified that the request was routine

7   practice and necessary to preserve the "integrity" of the undercover operation and any future

8   operations.  Almost immediately after making the request, detectives lost visual contact with

9   Schultz' car.  However, the detectives continued to conduct surveillance in the general area.

10          Just before 9:45 p.m., Giannone testified that Sergeant Jim Siwy saw the Schultz' car and

11   informed him that it was traveling westbound on Ford Road.  As Schultz' vehicle approached the

12   intersection of Ford Road and Las Vegas Boulevard, Giannone testified that he saw Schultz roll

13   through a stop sign and turn north onto Las Vegas Boulevard.  Rather than initiate a traffic stop,

14   Giannone informed the other detectives, via his cell phone, that Schultz had run another stop sign

15   and was traveling northbound on Las Vegas Boulevard.  At approximately 9:46 p.m., Schultz pulled

16   into a parking lot at the corner of Windmill and Las Vegas Boulevard and went into a CVS

17   Pharmacy.[1]  The surveillance continued while Schultz was in the pharmacy.

18          While Schultz was in the pharmacy, Giannone met with LVMPD Patrol Officers Quintana

19   and Grantham in a Food 4 Less parking lot adjacent to the CVS Pharmacy.  Giannone told the

20   officers that Schultz was in the CVS Pharmacy, informed them of Schultz' criminal record, told them

21   that Schultz did not have a license, and informed them that the detectives would let them know when

22   Schultz exited the parking lot.  He also told the officers that he had seen Schultz roll through a stop

23   sign at Ford and Las Vegas Boulevard.  After approximately ten (10) minutes, Schultz came out of

24   the CVS Pharmacy and got back in his vehicle.  Giannone requested that the officers not perform a

25   traffic stop while Schultz was in the pharmacy or when he got back to his car.  Giannone testified

26   that it is "normal procedure" to wait until a vehicle is on a public road to pull it over.

27

28          [1] The facility was incorrectly identified as a Walgreen's in both the supplemental report and on
         direct examination of Giannone.

1    During the hearing on this matter, Officer Quintana confirmed that he had responded to a call

2    from dispatch to conduct a traffic stop on a car which had run a stop light at approximately 9:15 p.m.

3    He also confirmed that the detectives had communicated by radio that they had lost the vehicle and

4    that Giannone requested a meeting in the Food 4 Less parking lot.  Quintana testified that Giannone

5    told him that Schultz had rolled through a stop sign at Ford and Las Vegas Boulevard, may have a

6    gun, and had a substantial criminal history.  Quintana also testified that, regardless of Giannone's

7    instruction, because Schultz was suspected of having a gun, he would not have confronted Schultz

8    in the store or parking lot, preferring the more controlled environment of a traditional traffic stop.

9    Officer Grantham also testified at the hearing that he also responded to the call from dispatch

10   to conduct a traffic stop on behalf of the repeat offender unit detectives.  He also met with Giannone

11   in the Food 4 Less parking lot and confirmed Giannone's description of the suspect car and Schultz.

12   Finally, he testified that Giannone told the officers that Schultz had run a stop sign at Ford and Las

13   Vegas Boulevard.

14   At approximately 9:57 p.m., Detective Denton informed Quintana and Grantham that Schultz

15   had left the parking lot and was traveling northbound on Las Vegas Boulevard.  Within a few blocks,

16   Quintana initiated a traffic stop.  Schultz pulled into the parking lot of a local hotel but was not

17   legally parked.  Quintana approached Schultz and told him that he was being pulled over because

18   he was observed running a stop sign at Ford and Las Vegas Boulevard.  Schultz was unable to

19   produce a valid license or registration and informed Quintana that his license was suspended.  The

20   passenger's driver's license was also invalid.  After determining that the individuals did not have

21   valid driver's licenses, they were removed from the car.  Approximately 15 minutes after initiation

22   of the traffic stop, the officers determined that the vehicle would be towed because it was illegally

23   parked, and neither Schultz nor the passenger could produce a valid driver's license.

24   After Schultz was removed from the vehicle, Giannone approached Schultz and spoke with

25   him.  Giannone testified that he gave Schultz the *Miranda* warnings to which Schultz responded that

26   he understood his rights and was willing to talk with Giannone.  They spoke for approximately

27   twenty (20) minutes.  Giannone never inquired about a gun.  During this conversation, other officers

28   conducted an inventory search of the car prior to it being towed.  The officers discovered fake

- 4 -

1   identification documents and a stolen credit card.  Officers did not discover the gun during the

2   inventory search.  At the conclusion of the search, Schultz was arrested for  possession of a credit

3   card without the owner's consent and possession of false document to obtain false status.  He was

4   transported to the CCDC and booked on those charges.

5   **B. February 18, 2009, Custodial Interview**

6          After Schultz' arrest, Giannone received a second tip, from the same unidentified source,

7   indicating that the police had missed the gun during their inventory search.  Giannone did not get a

8   search warrant based on the information.  Instead, Giannone and Detective Denton traveled to CCDC

9   to interview Schultz.  Giannone brought a tape recorder with him to the jail to record the interview.

10  Unfortunately, the batteries in the recorder were dead.  Detective Denton did not bring his recorder.

11  Neither detective attempted to obtain new batteries prior to the interview.  Both detectives testified

12  that Giannone gave Schultz the *Miranda* warnings but, did not use a written waiver form.  Both

13  detectives testified that Schultz said that he understood his rights and was willing to speak with

14  them.

15         The interview lasted approximately thirty (30) minutes.  Both detectives testified that Schultz

16  made incriminating statements, including admitting that there was a gun in the vehicle and providing

17  a detailed description of its location.  Both detectives testified that Schultz never invoked his right

18  to remain silent or his right to an attorney, and never said that he wanted the interview to cease.

19  During the suppression hearing, Schultz gave limited testimony regarding the interview at CCDC.

20  He testified that he was not given the *Miranda* warnings prior to being asked questions about the

21  gun.  He also testified that he did not admit to having the gun, never told the detectives where the

22  gun could be found, and never answered any questions about the gun.  After the interview, Denton

23  applied for a search warrant based on the statements allegedly made by Schultz during the interview.

24  The application was granted and a search warrant issued.  During the second search of Schultz's

25  vehicle, police found the gun.

26         Now, Schultz requests that the Court suppress all evidence obtained as a result of the search.

27   Specifically, Schultz argues that the traffic stop violated the Fourth Amendment because (1) it was

28  not supported by probable cause and (2) was unreasonable due to the passage of time between the

1    infraction and stop.  Consequently, Schultz argues that the gun should be suppressed as the fruit of

2    an illegal search.   Schultz also argues that any alleged statements to law enforcement are

3    inadmissible because (1) he was not given the *Miranda* warnings and, (2) even if given the warnings,

4    he did not knowingly, intelligently, and voluntarily waive his rights.  Finally, Schultz argues that any

5    evidence obtained pursuant to the warrant ought to be suppressed because the search warrant was

6    based upon the statements allegedly made in the absence of the *Miranda* warnings or a valid waiver.

7         The Government opposes the motion on the grounds that (1) there was probable cause for

8    the stop and (2) that any passage of time between the traffic infraction and the traffic stop was

9    reasonable.  The Government further contends that Schultz' statements to law enforcement were the

10   result of a knowing, intelligent, and voluntary waiver of the *Miranda* warnings.  The Government

11   also contends that, even if the court were to conclude that the statements were taken in violation of

12   *Miranda*, they can still be used to support probable cause for issuance of the search warrant.

13                                          **DISCUSSION**

14   **A.  February 17, 2009: Traffic Stop**

15        The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons,

16   houses, papers and effects, against unreasonable searches and seizures shall not be violated."  U.S.

17   CONST. AMEND. IV.  It is well settled that a vehicle stop by the police is a seizure within the meaning

18   of the Fourth Amendment,  *United States v. Garcia*, 205 F.3d 1182, 1186 (9th Cir. 2000) (*citing*

19   *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), and is subject to the constitutional requirement that

20   it be reasonable.  *Prouse*, 440 U.S. at 653-54.  The decision to stop a vehicle is reasonable when

21   there is probable cause to believe a traffic violation occurred.  *Whren v. United States*, 517 U.S. 806,

22   810 (1996).

23        **1.  Traffic Stop Probable Cause**

24        As a threshold question, the court must determine whether there was probable cause to

25   believe a traffic infraction occurred.  Detective Giannone testified that he observed two separate

26   traffic infractions.  The basis for the stop was the second infraction.  Despite the discrepancy in the

27   details of the original arrest report and the supplemental report, the reports and hearing testimony

28   are consistent.  Both reports identify Schultz' failure to stop at the intersection of Ford and Las

1   Vegas Boulevard as the basis for the traffic stop.  The additional details in the supplemental report

2   and the hearing testimony simply provide a more detailed factual background of the events on

3   February 17, 2009.

4        Further, Giannone's testimony was consistent with the details contained in the reports.  On

5   direct examination, Giannone testified that after losing Schultz' vehicle for approximately 30

6   minutes, Sergeant Siwy informed him that Schultz was traveling westbound on Ford Road.

7   Giannone testified that when the vehicle reached the intersection of Ford Road and Las Vegas

8   Boulevard it failed to stop.  He relayed this information to the other detectives via his cell phone.

9   Giannone did not relay the information through dispatch.  At approximately 9:46 p.m., Siwy relayed

10  through dispatch that Schultz' vehicle was traveling northbound on Las Vegas Boulevard.  On cross-

11  examination, Giannone confirmed that the dispatch printout does not contain any reference to the

12  alleged second traffic infraction.  He conceded that, based solely on the dispatch report, it appears

13  that Sergeant Siwy was the first person to find Schultz' vehicle.

14       Nevertheless, Giannone continually maintained that he saw Schultz roll through the stop sign

15  at Ford and Las Vegas Boulevard and the Court finds his testimony credible.  The absence of a

16  notation in the dispatch log is not dispositive of the actual events.  It is understandable that law

17  enforcement may use cell phones at times, rather than their radios, to communicate with each other.

18  Additionally, Giannone relayed his personal observations to the other detectives via his cell phone.

19  Each government witness confirmed that Giannone broadcast that Schultz ran the stop sign at Ford

20  and Las Vegas Boulevard.  The observation was memorialized separately in a search warrant

21  affidavit and listed in the original arrest report as the reason for the traffic stop.  Even Schultz'

22  witness confirmed that the officer conducting the stop stated that Schultz was being pulled over for

23  running a stop sign at the intersection of Ford and Las Vegas Boulevard.

24       The testimony and evidence in the record outweighs the testimony from Schultz' ex-

25  girlfriend that Schultz could not have run the stop sign because that intersection is always busy.  The

26  events occurred late on a Tuesday night in the middle of February.  The court does not find the claim

27  that the intersection was "busy" credible given the time, date, and location of the alleged infraction.

28  The record is sufficient to establish the Government's claim that Schultz rolled through a stop sign

1    at Ford and Las Vegas Boulevard.  Accordingly, the Court finds that there was probable cause for

2    the traffic stop.

3            **2. Traffic Stop: Another Officer's Observation**

4            The next question is whether Officer Quintana could perform the stop based on Giannone's

5    observation.  The recent Ninth Circuit decision in *United States v. Miranda-Guerena*, 445 F.3d

6    1233, 1237 (9th Cir. 2006), is instructive.  In *Miranda-Guerena*, the Tuscon Police Department,

7    acting on a tip, began surveillance of the defendant which continued for several days.  During the

8    course of the surveillance, a Tuscon police officer observed the defendant riding as a passenger in

9    a vehicle.  The officer determined that conducting a traffic stop would be preferable to a purely

10    investigative stop because he was not in a marked patrol car and he did not want to compromise the

11    ongoing narcotics investigation.  445 F.3d at 1235.  Accordingly, the officer contacted the Pima

12    County Sheriff's Department and asked them to conduct a stop based on his observation of a traffic

13    violation.  The Pima County Sheriff's Department agreed  and a deputy subsequently made the stop

14    which led to the seizure of crack cocaine.

15            The district court denied the defendant's motion to suppress without reaching the issue of

16    whether the stop was supported by reasonable suspicion of a traffic violation.  On appeal, the Ninth

17    Circuit addressed the issue of whether the Fourth Amendment requires an officer conducting a traffic

18    stop to have personally witnessed the infraction upon which the stop is based.  The Ninth Circuit,

19    citing *United States v. Hensley*, 469 U.S. 221 (1985) held that "[t]here is no reason traffic stops

20    should be treated differently from reasonable suspicion for investigatory stops in general."  The

21    Fourth Amendment does not require a traffic infraction to be personally observed by the officer

22    conducting the stop. *Miranda-Guerena*, 445 F.3d at 1237.  Based on the record here, and consistent

23    with *Miranda-Guerena*, it was reasonable for Quintana to conduct the traffic stop based upon the

24    traffic infraction observed by Giannone.

25            **3. Traffic Stop: Delay**

26            Schultz also argues that the stop was unreasonable because of the passage of time between

27    the infraction and the stop.  Schultz concedes that there does not appear to be a "bright line" for

28    when the reasonableness of a stop dissipates, but contends that the court must conduct a balancing

1   test pursuant to *United States v. Grigg*, 498 F.3d 1070 (9th Cir. 2007).  The Court declines to engage

2   in the balancing test advocated by Schultz.  The Court has already determined that there was

3   probable cause for Quintana to conduct the traffic stop based on the infraction witnessed by

4   Giannone.  Quintana conducted the stop approximately 15-20 minutes after the infraction.  The

5   passage of time between the traffic infraction and the traffic stop itself was reasonable.  It is true that

6   the detectives and officers chose not to approach Schultz while he was in the CVS Pharmacy.  It is

7   also true that the detectives instructed the officers to wait until the vehicle was back on a public road

8   before initiating the stop.  However, Officer Quintana testified that, even absent that instruction, it

9   was his determination that it was safer to conduct the stop once Schultz was back on a public road.

10  Quintana believed that entering a store would have unnecessarily increased the potential danger to

11  the public, Schultz, and himself.  Quintana's decision demonstrates reasonable restraint.

12  Accordingly, the court need not engage a balancing analysis because there was reasonable suspicion

13  to conclude that a traffic violation had occurred and the passage time between the infraction and the

14  stop was not unreasonable.  *Cf.*, *Miranda-Guerena*, 445 F.3d at 1236 (citing *United States v. Willis*,

15  431 F.3d 709, 714 (9th Cir. 2005).

16          **4. The Inventory Search**

17          When the officers initiated the stop,  Schultz pulled off the roadway and into the parking lot

18  of a local hotel.  The officers approached and determined that neither Schultz nor the passenger had

19  a valid driver's license.  Accordingly, the officers decided to impound the vehicle and therefore had

20  to perform an inventory search.

21          Inventory searches are a well-defined exception to the warrant requirement.  *Colorado v.*

22  *Bertine*, 479 U.S. 367, 371 (1987).  Once a vehicle has been impounded, the police may conduct an

23  inventory search.  *South Dakota v. Opperman*, 428 U.S. 364, 369 (1975).  The purposes of an

24  inventory search are threefold: (1) the protection of the vehicle owner's property; (2) the protection

25  of police against claims by the owner; and (3) the protection of the police from potential danger.

26  *United States v. Wanless*, 882 F.2d 1459, 1463 (9th Cir. 1989) (citation omitted).  "In order to ensure

27  that the inventory search is 'limited in scope to the extent necessary to carry out the caretaking

28  function,' it must be carried out in good faith and in accordance with the standard procedures of the

1    local police department. *Wanless*, 882 F.2d at 1463 (quoting *Opperman*, 428 U.S. at 375); *see also*

2    *Colorado v. Bertine*, 479 U.S. 367, 374 n. 6 (1987) ("reasonable police regulations relating to

3    inventory procedures administered in good faith satisfy the Fourth Amendment"). "[A]n inventory

4    search must not be a ruse for general rummaging in order to discover incriminating evidence."

5    *Florida v. Wells*, 495 U.S. 1, 4 (1990).

6          Here, the vehicle was impounded and an inventory search performed because there wasn't

7    a licensed driver available to move the vehicle. Schultz, of his own accord, pulled off the road and

8    into a parking lot. If he had pulled into a lawful parking spot, the impound and search would not

9    have occurred.

10         Schultz' argument that the police should have exercised discretion and permitted the

11   passenger to contact her mother and have her retrieve the vehicle is also rejected. An impound

12   policy vesting an officer with discretion to choose between impounding a vehicle or not, does not

13   render the policy or the officer's choice unconstitutional. *See Bertine*, 479 U.S. at 375 (department

14   regulations which give police officers discretion to choose between impounding a vehicle or not

15   impounding a vehicle are not improper so long as police discretion is exercised "according to

16   standard criteria and on the basis of something other than suspicion of criminal activity"). The

17   police need only demonstrate that they can meet one of the specified circumstances for impounding

18   a vehicle. The fact that the vehicle was not lawfully parked and there was not a licensed driver at

19   the scene is an adequate basis for an impound and inventory search under LVMPD policy.

20         During the course of the inventory search, Shultz spoke with Giannone. Giannone testified

21   that he gave Schultz the *Miranda* warnings and that Schultz indicated that he understood his rights

22   and was willing to waive them. They spoke for approximately twenty (20) minutes but did not speak

23   about the gun. During the inventory search, the officers discovered fake identification documents

24   and a stolen credit card, but no gun. At the conclusion of the search, Schultz was arrested for

25   possession of a credit card without the owner's consent and possession of false document to obtain

26   false status and transported to the CCDC. Schultz does not argue that the conversation between

27   himself and Giannone on the night of the arrest violated constitutional norms.

28   . . . .

1    **B. February 18, 2009, Custodial Interview**

2        The obligation to administer *Miranda* warnings attaches once a person is subject to "custodial

3    interrogation." *Miranda v. Arizona*, 384 U.S. 436, 445 (1966).  Custody turns on whether there is

4    a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

5    *U.S. v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (citing *United States v. Kim*, 292

6    F.3d 969, 973 (9th Cir. 2002)).  In addition to being in custody, the accused must also be subject to

7    interrogation.  *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).  Not every question asked in a

8    custodial setting constitutes interrogation.  *U.S. v. Chen*, 439 F.3d 1037, 1040 (9th Cir. 2006) (citing

9    *U.S. v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1982)).  "[I]nterrogation means questioning or 'its

10   functional equivalent,' including 'words or actions on the part of the police (other than those

11   normally attendant to arrest and custody) that the police should know are reasonably likely to elicit

12   an incriminating response from the suspect."  *Pope v. Zenon,* 69 F.3d 1018, 1023 (9th Cir.1995)

13   (quoting *Innis*, 446 U.S. 291 at 301).  "The latter portion of this definition focuses primarily upon

14   the perceptions of the suspect, rather than the intent of the police.  *Id*.  Here, it is undisputed that the

15   February 18, 2009, interview constituted custodial interrogation requiring the *Miranda* warnings.

16       **1. Miranda Warnings**

17       The *Miranda* warnings  are prophylactic and are "not themselves rights protected by the

18   Constitution but [are] instead measures to insure that the right against compulsory self-incrimination

19   [is] protected."  *Michigan v. Tucker*, 417 U.S. 433, 444 (1974).  In *California v. Prysock*, 453 U.S.

20   355 (1981), the Supreme Court stated that "no talismanic incantation [is] required to satisfy" the

21   strictures of *Miranda*. 453 U.S. at 359.  Owing to the fact that officers in the field may not always

22   have immediate access to printed *Miranda* warnings, it is not necessary that the warnings be given

23   with the precise words used in *Miranda*.  *See United States v. Mejia*, 559 F.3d 1113, 1117 (9th Cir.

24   2009) (*citing Duckworth v. Eagan*, 492 U.S. 195, 203 (1989).  The inquiry is whether the warnings

25   reasonably convey the substance required by *Miranda*.  *Duckworth*, 492 U.S. at 203.

26       In this case, one day after Schultz' arrest, Giannone received a second tip from the same

27   unidentified source indicating that the police had missed the gun during their inventory search.

28   Based on the tip, Giannone and Detective Denton, went to the CCDC to interview Schultz.  Both

1   detectives testified that Giannone gave Schultz the *Miranda* warnings. Schultz testified that neither

2   detective gave the *Miranda* warnings prior to asking him questions about the gun.  Based on the

3   testimony of the two officers, the court concludes that Schultz was given the *Miranda* warnings prior

4   to the interview.

5          **2. Waiver**

6          "There is a presumption against waiver, of which the Government bears the heavy burden

7   of overcoming by a preponderance of the evidence." *United States v. Crews*, 502 F.3d 1130, 1139-

8   40 (9th Cir. 2007) (citing *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998).  To overcome

9   the presumption, the government must prove, by the totality of the circumstances, that Schultz was

10  aware of the nature of the right being abandoned and the consequences of the abandonment.

11  *Garibay*, 143 F.3d at 536.  Factors to be considered are (1) Schultz' mental capacity, (2) whether

12  Schultz signed a written waiver, (3) whether Schultz was advised of his rights in his native tongue,

13  (4) whether Schultz appeared to understand his rights, (5) whether the rights were individually and

14  repeatedly explained to Schultz, and (6) Schultz' prior experience with the criminal justice system.

15  *Garibay*, 143 F.3d at 537-39.

16         The failure of the detectives to record the conversation or provide a written waiver is not

17  dispositive.  Waivers need not be express: "a suspect may impliedly waive the rights by answering

18  an officer's questions after receiving *Miranda* warnings."  *United States v. Rodriguez*, 518 F.3d

19  1072, 1080 (9th Cir. 2008) (quoting *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127,

20  *amended*, 416 F.3d 939 (9th Cir. 2005).  Both detectives testified that Schultz stated that he

21  understood his rights and wished to speak with them. There is nothing in the record suggesting that

22  Schultz' mental capacity prevented him from understanding the nature of the rights or consequences

23  of abandoning them.  Schultz has extensive experience with the criminal justice system.  The

24  interview only lasted approximately thirty (30) minutes. The detectives testified that Schultz never

25  invoked his right to remain silent, his right to an attorney, or indicated that he did not want to

26  continue with the interview.  The detectives testified that Schultz admitted that there was a gun in

27  the vehicle and provided a detailed description of its location.  The only contrary evidence is Schultz

28  own testimony. Based on the testimony of the detectives, the court finds that the record is sufficient

1    to conclude that the government has met its burden to show that Schultz waived his rights.

2        **3.** *Patterson*

3        The Government also argues that, even assuming there were no *Miranda* warnings, the gun

4    should not be suppressed.   Under *United States v. Patterson*, 812 F.2d 1188, 1193 (9th Cir. 1987),

5    *cert. denied*, 485 U.S. 922 (1988), a statement taken in violation of *Miranda* may not be used in the

6    prosecution's case in chief, but may be used in an affidavit to establish probable cause for a search

7    warrant if the statement was voluntary.  *Huu Thanh Nguyen v. Garcia*, 477 F.3d 716, 725 n 10 (9th

8    Cir. 2007), *cert. denied*, 522 U.S. 846 (2007) (citing *Patterson*, 812 F.2d at 1193).  The record before

9    the court indicates that Schultz' statements were voluntarily made.  There is no evidence that the

10   statements were obtained through physical or psychological coercion or by improper inducement.

11    There is no evidence to suggest that the detectives engaged in any outward showing of force through

12   the baring or brandishing of firearms.  There is no evidence to suggest the statements are the result

13   of Schultz' will being overborne. The court finds that Schultz statements during the custodial

14   interview were the product of rational and free will.  Accordingly, use of the statements to establish

15   probable cause for the search warrant, even assuming a *Miranda* violation, is permissible.

16                                              **RECOMMENDATION**

17        Based on the foregoing and good cause appearing therefore,

18        IT IS THE RECOMMENDATION of the undersigned Magistrate Judge that the

19   Defendant's Motion to Suppress (#18) be **DENIED**.

20                                                    **NOTICE**

21        Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must**

22   **be in writing and filed with the Clerk of the Court on or before June 1, 2010.** The Supreme

23   Court has held that the courts of appeal may determine that an appeal has been waived due to the

24   failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This

25   circuit has also held that (1) failure to file objections within the specified time and (2) failure to

26   properly address and brief the objectionable issues waives the right to appeal the District Court's

27   . . . .

28   . . . .

1   order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst*, 951 F.2d

2   1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

3         DATED this 18th day of May, 2010.

_____
ROBERT J. JOHNSTON
United States Magistrate Judge